619 So.2d 996 (1993)
LEE COUNTY, a political subdivision of the State of Florida, Petitioner,
v.
SUNBELT EQUITIES, II, LIMITED PARTNERSHIP, a Pennsylvania Limited Partnership, Respondent.
No. 92-03948.
District Court of Appeal of Florida, Second District.
May 14, 1993.
Rehearing Denied June 16, 1993.
*998 James G. Yaeger, County Atty., and Thomas L. Wright, Asst. County Atty., Fort Myers, for petitioner.
Steven C. Hartsell, Pavese, Garner, Haverfield, Dalton, Harrison & Jensen, Fort Myers, for respondent.
PER CURIAM.
We review Lee County's petition for writ of certiorari pursuant to Education Development Center, Inc. v. City of West Palm Beach Zoning Board of Appeals, 541 So.2d 106 (Fla. 1989) and City of Deerfield Beach v. Vaillant, 419 So.2d 624 (Fla. 1982). Finding that the circuit court did not apply the correct law to the facts and issues presented in this case, we grant the petition.

I. BACKGROUND
This action stems from a request for rezoning submitted by respondent Sunbelt Equities II (hereafter "Sunbelt"). Sunbelt owns a parcel currently zoned for agricultural use, upon which it wishes to construct a commercial/office development. Apparently the proposal is consistent with future land use projections as embodied in the Lee County comprehensive plan. However, opponents of the proposal have asserted that continuing the present zoning classification is preferable, at least for the time being.[1] Although county planning staff and a hearing examiner recommended approval of the *999 proposal with changes, the county commission overruled that recommendation and denied the rezoning. In so doing the commission issued a written resolution which made three separate findings of fact:[2]
(1) The proposal is inconsistent with the site location standards for Neighborhood Commercial Development as set forth in ... the Lee County Comprehensive Land Use Plan ... which requires Neighborhood Commercial Developments to be located at the intersection of a collector and arterial or an arterial and arterial road so as to allow access to two roads.
(2) The proposal would result in unreasonable development expectations which may not be achievable because of commercial acreage limitations on the "Year 2010 Overlay [map]" for the subdistrict in question in violation of... . the Lee County Comprehensive Land Use Plan.
(3) The proposal would permit a commercial development to locate in such a way as to open new areas to premature, scattered, or strip development....
Sunbelt then sought relief in circuit court via a proceeding the county aptly describes as a "hybrid."[3] The circuit court granted certiorari, "find[ing] that there was no substantial, competent evidence to support the decision of the Lee County Board of County Commissioners in ... denying [Sunbelt]'s application for rezoning." The county now asks us to review that decision.

II. REZONING: LEGISLATIVE OR JUDICIAL PROCEEDING?
The circuit court, in asserting its power to review the matter via certiorari, appears to have relied upon Snyder v. Board of County Commissioners of Brevard County, 595 So.2d 65 (Fla. 5th DCA 1991), jdn. accepted, 605 So.2d 1262 (Fla. 1992), which states that owner-initiated, site-specific rezoning proceedings are quasi-judicial in nature. The county had moved to dismiss Sunbelt's petition because, in its view, all zoning decisions are legislative rather than judicial. The difference between these concepts affects both the accepted method of subsequent judicial review and the scope of that review.

(a) Is there conflict between Snyder v. Brevard County and prior holdings of this court?
The county contends that Snyder conflicts with cases from this court describing rezoning as a legislative activity. See, e.g., Lee County v. Morales, 557 So.2d 652 (Fla. 2d DCA), rev. denied, 564 So.2d 1086 (Fla. 1990); Hirt v. Polk County Board of County Commissioners, 578 So.2d 415 (Fla. 2d DCA 1991).[4] Sunbelt disputes that conflict exists, and notes that our court has employed certiorari review in settings factually similar to the present case. Manatee County v. Kuehnel, 542 So.2d 1356 (Fla. 2d DCA), rev. denied, 548 So.2d 663 (Fla. 1989).
We agree that no material conflict arises between Lee County v. Morales and Snyder. Morales involved a comprehensive downzoning of an environmentally sensitive barrier island initiated by the county, and did not involve an owner-initiated zoning change. Moreover, any conflict between Snyder and Hirt v. Polk County exists only in dicta. Hirt was not a rezoning, but rather a neighboring property owner's challenge to approval of a Planned Unit Development. The case was disposed of on procedural grounds  the circuit court had dismissed Hirt's certiorari petition, and *1000 this court, finding the county's construction of applicable rules to have been a "judicial" undertaking, ordered the petition reinstated and decided on its merits.
In Hirt Judge Scheb engaged in a functional analysis of the underlying administrative proceedings quite similar to that in Snyder (and which was cited with approval in Snyder). Hirt states that the legislative versus judicial determination turns on (1) the nature of the challenge; and (2) the manner in which the zoning authority went about making its decision. Snyder, Sunbelt urges, is "the logical culmination of [this] functional analysis." However, Judge Scheb did remark in passing that rezonings were "legislative." 578 So.2d at 417. He did not distinguish between a county-initiated, broad-based rezoning, as in Morales, and a site-specific, owner-initiated rezoning as in Kuehnel.

(b) When, if ever, is rezoning a "judicial" matter?
Florida's appellate courts are neither unanimous nor consistent on the question whether rezonings are legislative or quasi-judicial.[5] Neither are they consistent about the method or scope of review. For example, in St. Johns County v. Owings, 554 So.2d 535 (Fla. 5th DCA 1989), rev. denied, 564 So.2d 488 (Fla. 1990), and Palm Beach County v. Tinnerman, 517 So.2d 699 (Fla. 4th DCA 1987), rev. denied, 528 So.2d 1183 (Fla. 1988), the courts applied the "fairly debatable" standard appropriate for legislative decisions, but reviewed the proceedings by certiorari as if they were judicial in nature.
"A judicial inquiry investigates, declares, and enforces liabilities as they stand on present facts and under laws supposed already to exist ... Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150, 158 (1908), quoted in Jennings v. Dade County, 589 So.2d 1337, 1343 (Fla. 3d DCA 1991), rev. denied, 598 So.2d 75 (Fla. 1992) (Ferguson, J., concurring). A judicial decision involves a controversy over how existing law affects a set of facts  what Judge Scheb called "enforcing" the current ordinance. 578 So.2d at 417. Placed in the zoning/code enforcement context, the court or agency asks: "Has the party done something in violation of the law?" or "Will the law allow the party to do what it wants?" By contrast, legislation changes the existing law. Arguably, it is immaterial whether such change stems from the fiat of the governing body (e.g. a comprehensive rezoning) or from an individual request to "change the law for me" (the Snyder/Sunbelt rezonings).
Snyder, in concluding that owner-initiated rezoning proceedings are nevertheless quasi-judicial in character, borrows heavily from two sources. One, Coral Reef Nurseries, Inc. v. Babcock Co., 410 So.2d 648, 652 (Fla.3d DCA 1982), declares that "it is the character of the administrative hearing leading to the action of the administrative body that determines the label to be attached to the action... ." The court in Coral Reef was deciding whether "administrative res judicata" operated to bar a second rezoning application; though they eventually determined that the nature of these rezoning hearings made them "judicial," the court went on to afford considerable deference to the local government in deciding whether circumstances had sufficiently changed to defeat application of the res judicata principle.
Another source is the widely-cited opinion of the Oregon Supreme Court, Fasano v. Board of County Commissioners of Washington County, 264 Or. 574, 507 P.2d 23 (1973). The plaintiffs in Fasano had unsuccessfully opposed a zoning change before their county commission, but prevailed at all levels of the Oregon court *1001 system because the rezoning was not shown to be consistent with the local comprehensive plan. The supreme court began its analysis by stating, "Any meaningful decision as to the proper scope of judicial review of a zoning decision must start with a characterization of the nature of that decision." 507 P.2d at 25-26. Most jurisdictions, including Oregon itself, heretofore had "state[d] that a zoning ordinance is a legislative act and is thereby entitled to presumptive validity." 507 P.2d at 26. This approach, however, may have been "ignoring reality." Id.
Ordinances laying down general policies without regard to a specific piece of property are usually an exercise of legislative authority, are subject to limited review and may only be attacked upon constitutional grounds for an arbitrary use of authority. On the other hand, a determination whether the permissible use of a specific piece of property should be changed is usually an exercise of judicial authority and its propriety is subject to an altogether different test.
Id.[6]
It is notable that Fasano, like most of the "consistency" cases we will discuss, involved a challenge to a rezoning that (initially) was successfully obtained despite a claim it was not only bad policy but not in compliance with the law. That is, Fasano (like Hirt) asked the question, unarguably judicial in character, "Does the existing law permit it?"
The fact remains, however, that many rezoning decisions are properly reviewable by certiorari. While legislative authority (that is, the discretion to determine what the law should be) may not be delegated, a legislative body may delegate to a board or official the authority to apply the law if sufficient standards and procedural safeguards are adopted to ensure a proper application of legislative intent. Most zoning ordinances delegate, with standards, the authority to decide such things as variances or conditional use approvals, and these quasi-judicial determinations are reviewable by certiorari. Similarly, the authority to decide what zoning district to apply to each property could, with adequate standards, become a delegated, quasi-judicial determination. Far more often, however, rezoning decisions are held to be reviewable by certiorari merely because a zoning ordinance, charter or special act provides that they shall be.
LaCroix, The Applicability of Certiorari Review to Decisions on Rezoning, Fla.B.J., June 1991, at 105 (footnotes omitted).
We believe a fair and workable solution is to adopt the functional analysis of Snyder, which is consistent procedurally with our prior decision in Manatee County v. Kuehnel. That is, we agree that site-specific, owner-initiated rezoning requests are sufficiently judicial in character that final administrative orders are thereafter appropriate for appellate review.

(c) What Does It Mean to Label a Proceeding "Judicial"?
Our decision to adopt this portion of the Snyder opinion will measurably affect those local governments who, in continuing to regard Snyder-type rezonings as purely legislative, may utilize overly informal procedures when considering such requests. "When acting in a truly legislative function, a legislative body ... is not required to make findings of fact and statement of reasons supporting its decision as is necessary in order for the courts to effectively review governmental action for compliance with constitutional and statutory rights and limitations." Snyder, 595 So.2d at 68.
The effect of labeling rezoning decisions as quasi-judicial is to refer them to an independent forum that is isolated as far as is possible from the more politicized activities of local government, much as the judiciary is constitutionally independent of the legislative and executive branches. Because *1002 these decisions today are inextricably linked with property rights-related claims, we view this shift toward enforced neutrality as salutary. The evolving law of property rights, exemplified by Lucas v. South Carolina Coastal Council, ___ U.S. ___, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), does not augur well for local governments who are reluctant to justify their decisions with explicit references to evidence and public policy. If reached under a veil of silence, even honest land-use decisions are vulnerable to charges of arbitrariness or improper motive.
Moreover, it is debatable whether the new procedural requirements implicit in our adoption of Snyder should be viewed either as onerous or as infringing upon powers traditionally reserved for local elected officials.
[W]e note that the quality of due process required in a quasi-judicial hearing is not the same as that to which a party to a full judicial hearing is entitled. Quasi-judicial proceedings are not controlled by strict rules of evidence and procedure. Nonetheless, certain standards of basic fairness must be adhered to in order to afford due process... . A quasi-judicial hearing generally meets basic due process requirements if the parties are provided notice of the hearing and an opportunity to be heard. In quasi-judicial zoning proceedings, the parties must be able to present evidence, cross-examine witnesses, and be informed of all the facts upon which the commission acts.
Jennings v. Dade County, 589 So.2d at 1340.

III. THE SCOPE OF REVIEW AT THE CIRCUIT AND D.C.A. LEVELS
It necessarily follows that any party adversely affected by a rezoning decision is entitled to some form of direct appellate review. Therefore, we turn to the standard of review that should be employed by the circuit and district courts when presented with such cases. At the outset we acknowledge the existence of several terms of art which warrant (and may sometimes lack) clear definition, among them "fairly debatable," "substantial competent evidence," and, in the wake of mandatory statewide comprehensive planning, "consistency" and "strict scrutiny." All come into play in Snyder and in the present case.

(a) "Fairly debatable" and "substantial competent evidence"
The terms "fairly debatable"  generally applied to sustain actions thought of as legislative  and "substantial competent evidence"  which must exist to support quasi-judicial determinations  may in fact be more similar than some decisional and textual authorities suggest.
The "fairly debatable" rule is a rule of reasonableness; it answers the question of whether, upon the evidence presented to the municipal body, the municipality's action is reasonably based. The primary purpose of the "fairly debatable" test is to allocate decision-making authority over zoning matters between the legislative municipal body and the judiciary. The test purports to prevent the court from substituting its judgment with regard to zoning ordinance enactments for that of the zoning authority. In other words, the "fairly debatable" test was created to review the legislative-type enactments of zoning ordinances.
Town of Indialantic v. Nance, 400 So.2d 37, 39 (Fla.5th DCA 1981), approved, 419 So.2d 1041 (Fla. 1982) (citations omitted; emphasis in original).
At issue in DeGroot [v. Sheffield, 95 So.2d 912 (Fla. 1957),] was the proper method and scope of review of a quasi-judicial county board determination. The DeGroot court held that where . .. notice and hearing are required and the judgment of the board is contingent on the showing made at the hearing, the action is judicial or quasi-judicial . .. The court then explained that "competent substantial evidence" was evidence a reasonable mind would accept as adequate to support a conclusion. The DeGroot "competent substantial evidence" standard of review of quasi-judicial action effectively provides the same standard the "fairly debatable" test provides for review of legislative municipal zoning action: For *1003 the action to be sustained, it must be reasonably based in the evidence presented."
400 So.2d at 40 (citations omitted).[7]

(b) "Consistency" and "Strict Scrutiny"
In Florida, all zoning and development permitting must now be consistent with the comprehensive plan of the city or county in question. See § 163.3161(5), Fla. Stat. (1991). The comprehensive plan has been likened to a "constitution" and has been described as "a limitation on a local government's otherwise broad zoning powers." Machado v. Musgrove, 519 So.2d 629, 632 (Fla.3d DCA 1987), rev. denied, 529 So.2d 693 (Fla. 1988).[8]See also, Hillsborough County v. Putney, 495 So.2d 224 (Fla.2d DCA 1986). And cf. City of Cape Canaveral v. Mosher, 467 So.2d 468, 471 (Cowart, J., concurring specially).
According to Machado, "where a zoning action is challenged as violative of the comprehensive land use plan, the burden of proof is on the one seeking a change to show by competent and substantial evidence that the proposed development conforms strictly to the comprehensive plan and its elements." Id. Thus arises the term "strict scrutiny." Apparently there is conflict, between Machado and Southwest Ranches Homeowners Association, Inc. v. Broward County, 502 So.2d 931 (Fla.4th DCA), rev. denied, 511 So.2d 999 (Fla. 1987), as to when "strict scrutiny" should be employed. See Mitchell, "In Accordance With a Comprehensive Plan: The Rise of Strict Scrutiny in Florida," 6 Fla.St. U.J.Land Use & Envtl.L. 79 (1990).[9]

(c) Scope of judicial review
The standards for judicial review of local government administrative actions were established by our supreme court in Education Development Center v. West Palm Beach and Deerfield Beach v. Vaillant.
At the circuit level, three questions are asked: whether due process was afforded, whether the administrative body applied the correct law, and whether its findings are supported by competent substantial evidence. This last requirement is susceptible to misunderstanding. It involves a purely legal question: whether the record contains the necessary quantum of evidence. The circuit court is not permitted to go farther and reweigh that evidence (e.g., where there may be conflicts in the evidence), or to substitute its judgment about what should be done for that of the administrative agency. Bell v. City of Sarasota, 371 So.2d 525 (Fla.2d DCA 1979).
On further review by certiorari in the District Courts of Appeal, only the first two questions are considered. Where (as in the present case) there is no suggestion of a due process violation in the initial appeal, the district court determines only whether the circuit court "applied an incorrect principle of law." Education Development Center, 541 So.2d at 108. We may not exceed these extremely restrictive parameters and "disagree[] with the circuit court's evaluation of the evidence." 541 So.2d at 108-9. Thus, if the correct rule of law for a circuit court to apply were the "substantial competent evidence" standard, *1004 and the court did apply that standard, its decision should be sustained. Our power of review would entitle us to quash the circuit court's decision only if it imposed a different standard upon the parties than that required by law. Kuehnel.
Our reading of Snyder convinces us that the district court in that case, having reached a supportable conclusion that site-specific rezonings are quasi-judicial proceedings, thereafter embarked upon a considerable departure from prior holdings in the realm of land use law. We decline to adopt the remainder of the Snyder decision, for reasons we will explain in due course. Accordingly, by imposing upon Lee County certain burdens of proof required by Snyder, the circuit court did apply the incorrect law to the dispute between the county and Sunbelt, justifying our issuance of a writ of certiorari.

IV. WHERE SNYDER HAS DEPARTED FROM PRECEDENT

(a) What Must Be Shown Under Snyder

After a lengthy discussion of related legal issues ranging from the legislative/judicial distinction to private property rights, the Snyder court stated its conclusions, beginning with the statement that "[t]he initial burden is on the landowner to demonstrate that ... the use sought is consistent with the applicable comprehensive zoning plan." 595 So.2d at 81. Assuming this can be done,
the landowner is presumptively entitled to use his property in the manner he seeks unless the opposing governmental agency asserts and proves by clear and convincing evidence that a specifically stated public necessity requires a specified, more restrictive use. After such a showing the burden shifts to the landowner to assert and prove that such specified more restrictive land use constitutes a taking of his property for public use for which he is entitled to compensation... .
Id. (emphasis ours; footnote omitted).

(b) The Distinction Between Zoning and Comprehensive Planning
Perhaps we read too much into the use, in Snyder, of the term "comprehensive zoning plan," but it gives us pause. As is made clear in Machado and other "consistency" cases, comprehensive planning and zoning are interrelated but different functions of local government. "As the court in [Jacksonville Beach v.] Grubbs noted, the purpose of a comprehensive plan is to set general guidelines for future development, and not necessarily to accomplish immediate land use changes." Southwest Ranches, 502 So.2d at 936. A comprehensive plan might accommodate a range of permissible zoning categories for a given area. In a case decided after the advent of comprehensive planning but before the 1985 Growth Management Act mandated such planning statewide, the Third District Court of Appeal held that it is within the discretion of a local government to impose a zoning category at the low end of that range. Dade County v. Inversiones Rafamar, S.A., 360 So.2d 1130 (Fla.3d DCA 1978). Until Snyder there was no reason to suspect this was not still a correct statement of law.[10]
In contrast to Inversiones Rafamar, Snyder seems to place little credence in zoning classifications, as opposed to the broader land use projections embodied in a comprehensive plan, particularly where the zoning in question would allow only low-intensity uses of the land. Perhaps this skepticism might be supportable based on record evidence presented in the Snyder hearings and circuit court proceedings, but we find the district court's pronouncements unacceptably overbroad if intended for general application to all jurisdictions statewide:
Most communities in actual practice have zoned their undeveloped land under a highly restrictive classification such as *1005 "general use" and agriculture... . The original intent was not to permanently preclude more intensive development but to adopt a "wait and see attitude toward the direction of future development. Most government officials have little motivation to incur the "wrath of neighbors by zoning vacant land for industrial, commercial, or intensive residential development in advance of an actual proposal for development."
In reality, therefore, at the inception of zoning most land was zoned according to its then use, exceptions were grandfathered in and most vacant land was under-zoned or "short-zoned." In order for development to proceed, rezoning becomes not the exception, but the rule ... [R]ezoning is granted not solely on the basis of the land's suitability to the new zoning classification and compatibility with the use of surrounding acreage, but, also and perhaps foremost, on local political considerations including who the owner is, who the objectors are, the particular and exact land improvement and use that is intended to be made and whose ox is being fattened or gored by the granting or denial of the rezoning request.
595 So.2d at 72-3 (citations omitted).[11]
It has long been the law that when the applicant makes a threshold showing that existing zoning is unreasonable, the local government must prove otherwise. See, e.g., City of St. Petersburg v. Aikin, 217 So.2d 315 (Fla. 1968); City of Jacksonville Beach v. Grubbs, 461 So.2d 160 (Fla.1st DCA 1984), rev. denied, 469 So.2d 749 (Fla. 1985). However, absent the assertion of some enforceable property right, an application for rezoning appeals at least in part to local officials' discretion to accept or reject the applicant's argument that change is desirable. The right of judicial review does not ipso facto ease the burden on a party seeking to overturn a decision made by a local government, and certainly does not confer any property-based right upon the owner where none previously existed.
An old saying has it, "If you bought a swamp, there is some presumption you wanted a swamp." Put another way, there must be some presumption, even if only an easily rebuttable one, that land zoned for agricultural use is best suited for that purpose. This does not mean that comprehensive planners, with an eye toward conditions years hence, might not expect that same land someday to be crowded with houses, industrial plants, or commercial establishments. Nor does it mean that zoning authorities, during their initial (and truly "legislative") attempts to classify properties, always act wisely or fairly in designating low-intensity uses. However, implicit in Snyder is a suggestion that the future-oriented comprehensive planning process[12] always will result in a more accurate and appropriate use designation than will the more immediate act of zoning a specific parcel. We believe that both a comprehensive plan and a zoning classification are presumptively valid, and that one seeking a change in either has the burden of showing its invalidity.
Moreover, when it is the zoning classification that is challenged, the comprehensive plan is relevant only when the *1006 suggested use is inconsistent with that plan. Where any of several zoning classifications is consistent with the plan, the applicant seeking a change from one to the other is not entitled to judicial relief absent proof the status quo is no longer reasonable. It is not enough simply to be "consistent"; the proposed change cannot be inconsistent, and will be subject to the "strict scrutiny" of Machado to insure this does not happen.

(c) "Clear and Convincing Evidence"
The use, in Snyder, of the term "clear and convincing evidence" (as opposed to "substantial competent evidence") is derived from Department of Law Enforcement v. Real Property, 588 So.2d 957 (Fla. 1991), and numerous other cases, all of which involve a clear and acknowledged deprivation of property or other fundamental legal rights. See 595 So.2d at 81 n. 70. Heretofore it has never been a requirement in zoning cases that an existing classification be substantiated to this degree.[13] We believe this shift in the burden of proof derives from an incorrect assumption about the nature and extent of a landowner's property rights.
It has never been the law that a landowner is always entitled to the "highest and best" use of his land. See Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). This is not to suggest that a local government, in enacting land use codes, may disregard the landowner's rights. First of all, land use restrictions must substantially advance some legitimate state interest, or they are invalid. Nollan v. California Coastal Commission, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Second, they cannot be so intrusive as to deprive the landowner of reasonable economic use of the property, nor should previously permissible or "grandfathered" uses be incautiously rescinded. Lucas. However, assuming a regulation is necessary for the welfare of the public, and is not physically invasive or confiscatory of some existing property right, it is probably within the government's "police power" to enact it. Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).
It must be remembered that zoning ordinances, comprehensive plans, and similar enactments are (or should be) debated in a public forum with all affected parties having the right to be heard. Thereafter, the dissatisfied landowner has several avenues of redress, including injunctive relief against the enforcement of the offending ordinance or a suit for inverse condemnation. Even the landowner who is temporarily satisfied with the status quo is not without options when conditions change and undercut what once were reasonable expectations of fruitful use. This is the occasion for the Snyder-type individualized rezoning application, which we now declare to be quasi-judicial and therefore subject to procedural safeguards.
That such a system is not flawless is to be expected  repairing the errors that sometimes occur may expend resources and judicial labor. The alternative, however, is to reject or at least fundamentally undercut the power of local governments to superintend the use of real property. The Supreme Court, whose most "conservative" statement may have come in Lucas, has never interpreted the Fifth Amendment *1007 "just compensation" clause (the source of "takings jurisprudence") as demanding this. In the wake of Lucas, Nollan, and related cases, those favoring land use restrictions may find their activities the subject of heightened scrutiny into their reasonableness and intrusiveness. However, and despite the apprehensions (or hopes) of some observers, more fundamental change than this did not occur in Lucas.[14]

(d) Reconciling Our Views with the Procedure Adopted in Snyder

The courts, reviewing a rezoning application, should not presume the landowner does or can assert an enforceable property right, one which triggers application of the "clear and convincing evidence" standard, every time a more intensive use of the property is sought. Instead, the landowner must prove the existence of such a right, not just consistency with a comprehensive plan, before so rigorous a burden will be imposed upon the local government. The question arises, however, just how much the landowner must prove before the burden shifts.
In this regard, we have no quarrel with the procedure adopted in Snyder up to a point. Snyder accepts, for example, that the initial burden is still upon the applicant, who must demonstrate something more than that a rezoning is subjectively desirable. Before the advent of mandatory statewide comprehensive planning, that "something" was whether "the existing ordinance was confiscatory in effect." St. Petersburg v. Aikin, 217 So.2d at 317. For the most part Snyder can be interpreted as easing this burden without actually changing the law. Its emphasis on "consistency" means that wherever planners have determined a particular use is someday acceptable, the local government must now prove that the present zoning is not confiscatory rather than requiring the landowner to prove it is confiscatory.
So far this shifting of burdens, which emphasizes that governments must bear some responsibility to act carefully when restricting property rights, can be accommodated without abandoning traditional notions about the "police power" that underlies all zoning ordinances. It is at this point that Snyder most clearly departs from precedent. According to Snyder, once a rezoning proposal is shown to be "consistent," the local government must prove by clear and convincing evidence, that "public necessity requires a ... more restrictive use." Instead, we believe that the local government is required only to show by substantial competent evidence that the existing (obviously more restrictive) zoning classification was enacted in furtherance of some legitimate public purpose and that the public interest is legitimately served by continuing that classification. If the zoning ordinance was constitutional ab initio, and it remains constitutional in the face of whatever changes have prompted the landowner to request rezoning, the rezoning may be refused provided the local government can justify this conclusion with evidence on the record. Assuming it can do that, Snyder thereafter correctly shifts the burden back to the landowner "to assert and prove ... a taking"  that is, that the ordinance is confiscatory.

V. RESOLVING THE SUNBELT REZONING APPLICATION
Implicit in the circuit court's holding is an acceptance of Sunbelt's argument that its design is consistent with the Lee County comprehensive plan. There is evidence to support this argument, albeit contradicted by the county commission ordinance. Although Sunbelt's property is currently zoned "agricultural," a Future Land Use Map depicts the surrounding area as "suburban." Such a designation limits commercial development to "neighborhood centers," which in turn are limited to a maximum of 100,000 square feet. Sunbelt *1008 has projected only 65,000 square feet of commercial space.[15] A hearing officer did find that a final development order cannot be issued until after certain amendments are made to the Sunbelt application; Sunbelt "is fully aware of this impediment," and the mere acts of rezoning and approval of the "master concept plan" do not ipso facto "bestow or vest any development rights."
However, if (as we believe) Snyder is incorrect, it is not enough that Sunbelt's proposal is consistent with what Lee County planners envision as the eventual buildout of this area. One must also look to the present character of the area, which is reflected in the existing zoning classification. This aspect of the comprehensive plan represents, in effect, a future ceiling above which development should not proceed. It does not give developers carte blanche to approach that ceiling immediately, or on their private timetable, any more than a city or county is entitled to view its planning and zoning responsibilities as mere make-work.
Nothing in this opinion is intended to imply that Sunbelt, after remand, cannot establish a present right to the rezoning it desires. However, the mere fact of consistency with the comprehensive plan, even if undisputed by the county, would not mandate such a result. To sustain the county's decision to deny, it is sufficient that the record reflect substantial competent evidence favoring continuation of the status quo.[16] This decision likely will require analysis of the reasons underlying the present zoning classification  whether it represents a considered belief that agriculture is the most appropriate use, or was idly chosen as the court suggested had occurred in Snyder.
The petition for writ of certiorari is hereby granted, the order of the circuit court is quashed, and this case is remanded for further proceedings consistent with this opinion.
HALL, A.C.J., and THREADGILL and BLUE, JJ., concur.
NOTES
[1] A collateral issue in the proceedings below was Sunbelt's contention that "the real reason the application was denied" was the vocal opposition of residents of a neighboring development. Clearly, such opposition, to the extent it reflects a subjective "polling" rather than a discrete legal argument, is not a valid basis for denying a permit or rezoning application. Pollard v. Palm Beach County, 560 So.2d 1358 (Fla. 4th DCA 1990). However, accepting the notion that rezonings are quasi-judicial does not operate to exclude the public from those proceedings where such applications are considered on their merits. The need to allow such public access, which includes the right to voice objections (at least on the part of those claiming to be substantially affected by the pending action), points out the difficulty in completely depoliticizing such proceedings. The requirement of providing specific reasons for a ruling, in accord with the characterization of such proceedings as quasi-judicial, should diminish (if not altogether eliminate) the likelihood those mandatory findings will only mask the "real reason [an] application was denied."
[2] Sunbelt attempts to depict all three of these findings as "erroneous." It may be that the circuit court agreed with Sunbelt's evaluation. If this were the only issue before us, we would be compelled to uphold the circuit court so long as it otherwise applied the correct principle of law. That is, we would not reweigh the circuit court's determination whether or not adequate evidence was presented.
[3] In addition to a petition for certiorari, Sunbelt filed an original action pursuant to § 163.3215, Fla. Stat. (1991). The county claims that certain statutory prerequisites were overlooked which require dismissal of the civil action. Because the circuit court addressed the certiorari petition on its merits, the second case is not before us at this time.
[4] But see Grady v. Lee County, 458 So.2d 1211 (Fla.2d DCA 1984) (discussing the effect of a Lee County zoning ordinance which prescribes review by certiorari).
[5] If, indeed, such distinction can be clearly drawn. As one commentator concluded, after a lengthy analysis of the functional approach of Fasano v. Washington County, infra, "some zoning decisions are difficult to characterize as distinctly legislative or quasi-judicial." Peckingpaugh, "Burden of Proof in Land Use Regulation: A Unified Approach and Application to Florida," 8 Fla.St.U.L.R. 499 (1980).
[6] Fasano is not universally accepted as a correct statement of law or desirable judicial policy. One commentator, comparing decisions from "major comprehensive planning states," notes that California continues to adhere to the "legislative" option, and describes Fasano as "significantly discredited." Gougelman, The Death of Zoning As We Know It, Fla.B.J., March 1993, at 31 n. 35.
[7] In fact the terms were employed virtually interchangeably in Shaughnessy v. Metropolitan Dade County, 238 So.2d 466, 469 (Fla.3d DCA 1970), wherein the court found "competent, substantial evidence that the granting of the unusual or special use was at least fairly debatable."
[8] But see § 163.3161(8), Fla. Stat. (1991): "It is the intent of the legislature that [this Act] shall not be interpreted to limit or restrict the powers of municipal or county officials, but shall be interpreted as a recognition of their broad statutory and constitutional powers to plan for and regulate the use of land."
[9] In Southwest Ranches, neighbors of a proposed solid waste facility objected that the rezoning which permitted the facility was more intensive than, and therefore inconsistent with, the comprehensive plan. The district court held that "[w]here the zoning authority approves a use more intensive than that proposed by the plan ... the decision must be subject to stricter scrutiny than the fairly debatable standard contemplates." 502 So.2d at 936 (emphasis ours). See also Jacksonville Beach v. Grubbs, 461 So.2d 160, 163 n. 2 (Fla.1st DCA). By contrast, Machado holds that strict scrutiny applies "to [all] cases addressing the consistency of a development order with a comprehensive plan, regardless of the direction of the change." Mitchell, at 89.
[10] For example, § 163.3164(22), Fla. Stat. (1991), defining "land development regulations," implies the persistence of legislative recognition of the separate concept of zoning.
[11] Contrast such timid politics as described in Snyder with the reaction of the Fasano court to suggestions that "planning authorities be vested with the ability to adjust more freely to changed conditions": "[H]aving weighed the dangers of making desirable change more difficult against the dangers of the almost irresistible pressures that can be asserted by private economic interests on local government, we believe that the latter dangers are more to be feared." 507 P.2d at 29-30. And see Machado at 519 So.2d 634: "[T]he opponents, neighboring landowners, contend that conditions change in rapid and uncontrolled fashion in Dade County, increasing the need for costly public services and facilities, due to loose enforcement of the land use planning scheme." As we have elsewhere implied, most "strict scrutiny" cases prior to Snyder have invoked "consistency" to place brakes on development some thought too intensive, rather than to enforce a right to more intensive development than has been allowed. Reassessing site-specific rezonings as quasi-judicial should help place limits both on questionable runaway development and on intransigent, unrealistic underzoning of developable property.
[12] See, e.g., §§ 163.3167(1), 163.3177(1), and 163.3177(6)(a), Fla. Stat. (1991), all of which are distinctly future-oriented.
[13] Definitions of "clear and convincing evidence" abound. For example, the supreme court, in The Florida Bar v. Rayman, 238 So.2d 594 (Fla. 1970), appears to have contemplated something stronger than the "preponderance of evidence" standard ordinarily seen in civil cases, but less than the criminal "reasonable doubt" standard. Perhaps the best-known attempt to define the term occurs in Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983), wherein the court spoke of evidence or testimony that is "credible," "distinctly remembered," "precise," and "explicit"  evidence which "must be of such weight that it produces in the mind of the trier of fact a firm belief and conviction, without hesitancy, as to the truth of the allegation sought to be established." This would appear to us to be considerably more rigorous a standard of proof than the relatively deferential "competent substantial evidence" test applied to the quasi-judicial decisions of administrative bodies. This test requires "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla. 1957).
[14] This portion of our opinion analyzes the tension between regulation and property rights in light of decisions interpreting relevant portions of the United States Constitution. The test for "takings" under the Florida Constitution is substantially the same. See Graham v. Estuary Properties, 399 So.2d 1374 (Fla.), cert. denied sub nom. Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981).
[15] Sunbelt also wants to construct an additional 85,000 square feet for offices. Opponents of the project argued that the office space should be counted when calculating the total square footage, but a hearing officer found that the county's planning policy clearly dictates otherwise.
[16] Though the circuit court's order states that no such evidence was presented to support denial of the rezoning, the record suggests that the court did hold the county to the more rigorous burden of proof required by Snyder. There appears to have been no examination or consideration of the reasonableness of the existing zoning classification.